Jay D. Ellwanger (CA Bar No. 217747)
**ELLWANGER LAW LLLP**
8310-1 N. Capital of Texas Highway, Ste. 190
Austin, Texas 78731
jellwanger@equalrights.law
(737) 808-2260
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ESMÉ BIANCO,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN WARNER a/k/a MARILYN MANSON, individually, CIULLA MANAGEMENT, INC., and TONY CIULLA, individually,<br><br>Defendant. | No. 2:21-cv-3677<br><br>**COMPLAINT**<br><br>**(JURY TRIAL DEMANDED)** |

1. Plaintiff ESMÉ BIANCO; ("Ms. Bianco" or "Plaintiff"), by and through her attorneys, bring this action for damages and other legal and equitable relief, stating the following as Plaintiff's claims against BRIAN WARNER a/k/a MARILYN MANSON, individually ("Mr. Warner"), CIULLA MANAGEMENT, INC. ("Ciulla Management"), and TONY CIULLA, individually ("Mr. Ciulla" and, together with Ciulla Management and Mr. Warner, "Defendants"). Plaintiff demands a trial by jury.

## **INTRODUCTION**

2. This is an action brought by Plaintiff seeking damages from Defendants for sexual assault, sexual battery, and/or violations of the Trafficking Victims Protection Reauthorization Act, and any other cause(s) of action that can be inferred from the facts set forth herein.

3. Mr. Warner is a recording artist based in Los Angeles, California.

4.      Ciulla Management is a privately owned Los Angeles-based music management company established in 1996, whose clients have included Marilyn Manson, The Yeah Yeah Yeahs, Rob Zombie, First Aid Kit, and Tove Lo.

5.      Mr. Ciulla is a talent manager based in West Hollywood, California who served as the personal manager for Mr. Warner for over 25 years and who, upon information and belief, is the owner of Ciulla Management.

6.      Ms. Bianco is an internationally-acclaimed actress and performer, best-known for her role as "Ros" in the Emmy Award-winning show, *Game of Thrones*.

7.      Plaintiff alleges that she is entitled to recover general damages, special damages, and punitive damages, as well as such other and further relief as this Court finds necessary and proper.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367, which confers supplemental jurisdiction upon this Court for all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants maintain offices, conduct business, and reside in this District.

## PARTIES

10.     Defendant BRIAN WARNER a/k/a MARILYN MANSON is an individual who lives in Los Angeles, California.

11.     Defendant CIULLA MANAGEMENT is a privately held company with its headquarters located at 1509 N. Crescent Heights #4, West Hollywood, California 93313.

12. Defendant TONY CIULLA is an individual who lives in Los Angeles, California.

13. Plaintiff ESMÉ BIANCO is a person who has been aggrieved by Defendants' actions. She is a citizen of the United States of America and is a resident of the state of California.

**STATEMENT OF FACTS**

14. Ms. Bianco was introduced to Mr. Warner in 2005 through his then-fiancée. Mr. Warner expressed an interest in casting Ms. Bianco, who was beginning her acting career, in an upcoming film project. Over the next few years, the film project continued to be delayed, but Mr. Warner remained in touch with Ms. Bianco. Mr. Warned floated other projects for Ms. Bianco, but none materialized. Mr. Warner would meet with Ms. Bianco when he visited the United Kingdom for work, where she resided at that time.

15. After Mr. Warner's divorce in 2007, he made his first sexual overtures towards Ms. Bianco. He asked her for nude photographs on multiple occasions, each time playing the request off as a joke. He again made references to a potential film project in 2007.

16. In February 2009, Mr. Warner flew Ms. Bianco to Los Angeles for the first time—allegedly to film a music video for his song "*I want to kill you like they do in the movies*." Ms. Bianco understood this to be a professional project that would be publicly released after being filmed on Flip cameras by Mr. Warner himself. Upon arrival, Ms. Bianco found that there was no crew present and that she was expected to stay at Mr. Warner's home rather than in the hotel that had been previously booked. Throughout this shoot, Ms. Bianco was expected to be on-call 24/7 and as a result was subjected to sleep deprivation. She was told to wear lingerie as her "costume" for the video. She was not provided food during the four days she spent in Los Angeles, but was given drugs and alcohol.

17. In addition to these deprivations, Ms. Bianco was threatened and physically beaten by Mr. Warner. Mr. Warner repeatedly told Ms. Bianco that he would come to her room and rape

3      **COMPLAINT**

her during the night. He threw tantrums where he would destroy camera equipment and throw objects around the room. He forced Ms. Bianco to watch an extremely violent movie that caused her to faint. He attempted to force her to perform sexual acts on camera with another woman who was present throughout the shoot. Perhaps most horrifyingly, Mr. Warner locked Ms. Bianco in the bedroom, tied her to a prayer kneeler, and beat her with a whip that Mr. Warner said was utilized by the Nazis. He also electrocuted her.

18. Ms. Bianco believed that if she protested any of this treatment, she would be seen as unprofessional and barred from future professional opportunities—or worse, that Mr. Warner would continue to harm her. Plaintiff has never seen any footage from this shoot and, upon information and belief, it has never been published.

19. From February to May 2009, Mr. Warner assured Ms. Bianco that the video was being edited. He blamed others for the "disruptions" of the video shoot and convinced Ms. Bianco that he was simply eccentric, and his art was misunderstood.

20. In May 2009, Mr. Warner visited Ms. Bianco in London and they began a sexual relationship. Though at this time sex between Ms. Bianco and Mr. Warner was consensual, Mr. Warner bruised and bit Ms. Bianco and publicly groped her against her consent. He enforced a "dress code" for Ms. Bianco during this trip and forced her to sit at his feet during press visits. He verbally degraded her during interviews. He also attempted to bring a minor back to the hotel with him and Ms. Bianco.

21. After this visit, Ms. Bianco and Mr. Warner maintained a long-distance relationship for several years. Mr. Warner flew Ms. Bianco out to Los Angeles for visits and told her they would shoot videos and record music during these trips. No videos or music were recorded.

22. In April 2011, Mr. Warner convinced Ms. Bianco to move to Los Angeles to live with him while he helped her secure a visa and launch her career in the United States. Mr. Warner

defrauded Ms. Bianco by telling her that she would be starring in his upcoming feature film, *Phantasmagoria*, and instructed Ms. Bianco to create a timeline for shooting and rehearsals. Ms. Bianco spent two and a half months with Mr. Warner, enduring constant abuse. Mr. Warner controlled Ms. Bianco's movements and threatened to interfere with her visa process. Mr. Warner alternately kept Ms. Bianco awake for days at a time and then would lock her out of the apartment overnight. She was not permitted to leave the apartment without permission, nor was she permitted to receive visitors.

23. Mr. Warner kept the apartment in near-total darkness and insisted that the temperature remain at 63 degrees Fahrenheit. He was also frequently verbally abusive towards Ms. Bianco, sometimes in front of others. Mr. Warner would berate Ms. Bianco if he did not like her outfit, if she touched the thermostat, if she attempted to open the curtains in the apartment, if she expressed discomfort with the violent and sexually graphic films Mr. Warner played throughout the apartment, and if she failed to find objects he hid around the apartment. He also frequently became enraged and would violently throw things around the apartment.

24. On one occasion, Mr. Warner chased Plaintiff around the apartment with an ax, smashing holes in the walls. On another occasion, Mr. Warner cut Ms. Bianco with a Nazi knife during sex, without her consent, and photographed the cuts on her body. He then posted the photos online without her consent. Mr. Warner's friends, band mates, assistant, producer, and other colleagues witnessed various aspects of this abuse—including Mr. Ciulla. Ms. Bianco was only able to escape the apartment while Mr. Warner slept in June 2011. When Mr. Warner discovered Ms. Bianco had left, he threatened to have her visa revoked and to "punish" her when he next saw her.

25. In 2013, Ms. Bianco attended one of Mr. Warner's shows in Las Vegas. Afterwards, he forcibly kissed her without her consent and attempted to block her from leaving. Ms. Bianco was only able to leave when her friends intervened.

26. It took Ms. Bianco years to understand the extent of Mr. Warner's physical, sexual, psychological, and emotional abuse. Her career suffered due to the deterioration of her mental health caused by Mr. Warner. She deals with complex Post-Traumatic Stress Disorder, anxiety, depression, and panic attacks to this day as a result.

*Trafficking Victims Protection Act*

27. Mr. Warner employed fraud to bring Ms. Bianco to the United States. He promised work opportunities that never appeared while inserting himself in her visa process. Ms. Bianco reasonably relied upon Mr. Warner's promises of work due to his connections in the industry. Mr. Warner used both fraudulent offers of movie and music video roles to convince Ms. Bianco to travel to Los Angeles, whereupon Mr. Warner then made threats of force and performed violent sexual acts on Ms. Bianco to which she did not consent.

28. Because Mr. Warner had previously cast Ms. Bianco in what she believed to be a legitimate music video, her reliance on future projects was reliable. In fact, Mr. Warner went so far as to direct Ms. Bianco to draft paperwork to confirm that she would star in his upcoming film, for which rehearsals would begin shortly after her arrival in the United States.

29. Mr. Warner knew these offers to be fraudulent, as he had previously recruited Ms. Bianco to come to the United States to film a music video he never intended to publish. Upon information and belief, after Ms. Bianco's arrival, no effort was made to create the *Phantasmagoria* film. By inserting himself in Ms. Bianco's visa process, Mr. Warner was able to control Ms. Bianco by threatening to withdraw support if she displeased him. Mr. Warner's culpability is further demonstrated by preventing Ms. Bianco from escaping the situation by confining her to his

bedroom, threatening her if she attempted to leave the apartment without permission, restricting her communications, and interfering with her visa process.

30. In addition to the sexual acts demanded by Mr. Warner through force and/or threats of force, , Plaintiff was also required to provide unpaid labor for Mr. Warner during the April 2011 to July 2011 period. This included serving and preparing food for Mr. Warner and his guests, cleaning his apartment, consulting on his album, providing uncredited backup vocals during the creative process for the album *Born Villain*, and being offered up to his guests and bandmates to "spank." Mr. Warner implied that because he had brought Ms. Bianco to the United States and provided housing, she owed him labor and sexual intimacy. Plaintiff feared for her safety and that of her friends and family if she did not comply.

31. Mr. Ciulla and Ciulla Management jointly and severally represented Mr. Warner throughout this period. Mr. Ciulla and Ciulla Management knew of Mr. Warner's conduct and benefitted financially from allowing this abuse to continue. Ms. Bianco interacted daily with Mr. Warner's bandmates, producer, and assistants. These parties witnessed Mr. Warner's abuse directly and received photos from Mr. Warner of the damage he caused to Ms. Bianco. Mr. Warner's former assistants discussed Mr. Warner's abuse directly with Mr. Ciulla.

32. Ms. Bianco herself would contact Mr. Ciulla when Mr. Warner's temper tantrums ensued. Mr. Warner's assistant also coordinated Ms. Bianco's travel and lodging each time she visited Mr. Warner with full knowledge of Mr. Ciulla and Ciulla Management and acted as Ms. Bianco's "babysitter" when Mr. Warner was not present. Mr. Warner's management had a vested interest in supporting his violent tendencies to encourage the creation of his "art" and the promotion of the brand of Marilyn Manson, and were complicit in Mr. Warner's abuse of Ms. Bianco. It was only after these abuse allegations were made public in February 2021 that Mr. Ciulla and Ciulla Management withdrew from their representation of Mr. Warner—after more than 25 years.

*Sexual Assault & Sexual Battery*

33. Mr. Warner used drugs, force, and threats of force to coerce sexual acts from Ms. Bianco on multiple occasions. Mr. Warner raped Ms. Bianco in or around May 2011. Ms. Bianco was well aware of the violence Mr. Warner could dole out if she fought back, having been on the receiving end of his temper many times. He also supplied drugs to Ms. Bianco and deprived her of sleep and food in order to weaken her physically and mentally and decrease her ability to refuse him.

34. Mr. Warner committed sexual acts with Ms. Bianco when she was unconscious or otherwise unable to consent.

35. Mr. Warner also committed sexual battery against Ms. Bianco on multiple occasions throughout her time in Los Angeles in 2011. These acts include spanking, biting, cutting, and whipping Ms. Bianco's buttocks, breasts, and genitals for Mr. Warner's sexual gratification—all without the consent of Plaintiff.

## CAUSES OF ACTION

*AS AND FOR A FIRST CAUSE OF ACTION FOR SEXUAL ASSAULT, CA. CODE CIV. PRO. § 340.16, AGAINST DEFENDANT WARNER*

36. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

37. Defendant Warner committed a sexual assault of Plaintiff as more fully described in Section 243.4, 261, 262, 264.1, 286, 287, or 289, or former Section 288a, of the California Penal Code, and/or assault with the intent to commit any of those crimes, and/or or an attempt to commit any of those crimes.

38. Plaintiff's requests for relief are set forth below.

### AS AND FOR A SECOND CAUSE OF ACTION FOR SEXUAL BATTERY, CA. CODE. CIV. PRO. § 1708.5, AGAINST DEFENDANT WARNER

39. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

40. Defendant Warner acted with the intent to cause a harmful or offensive contact with an intimate part of Plaintiff, and a sexually offensive contact with Plaintiff directly or indirectly resulted.

41. Defendant Warner also acted with the intent to cause a harmful or offensive contact with Plaintiff by use of his intimate part, and a sexually offensive contact with that person directly or indirectly resulted.

42. Defendant Warner also acted to cause an imminent apprehension of the conduct described above, and a sexually offensive contact with Plaintiff directly or indirectly resulted.

43. Plaintiff's requests for relief are set forth below.

### AS AND FOR A THIRD CAUSE OF ACTION FOR A VIOLATION OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT ("TVPRA"), 18 U.S.C.S. § 1589, AGAINST DEFENDANTS WARNER, CIULLA, AND CIULLA MANAGEMENT

44. Plaintiff repeats and re-alleges the allegations contained in the paragraphs above, as if fully set forth herein.

45. Defendant Warner knowingly obtained the labor or services of Plaintiff by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; by means of serious harm or threats of serious harm to Plaintiff or another person; by means of the abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause Plaintiff to believe that, if she did not perform such labor or services, she or another person would suffer serious harm or physical restraint.

46. Defendants Ciulla and Ciulla Management knowingly benefited financially and/or by receiving value from their participation in a venture which engaged in the providing or obtaining of labor or services by any of the means described above, or knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

47. Plaintiff's requests for relief are set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself, prays for the following relief:

A. That Plaintiff be awarded actual damages;

B. That Plaintiff be awarded compensatory damages where available;

C. That Plaintiff be awarded punitive damages;

D. That Plaintiff be awarded pre and post judgment interest;

E. That the Court award Plaintiff her attorneys' fees and costs associated with this matter, including but not limited to expert fees and costs; and

Plaintiff further demands that she be awarded such other and further legal and equitable relief as may be found appropriate and as the Court may deem just or equitable.

Dated: April 30, 2021

Jay D. Ellwanger
California Bar No. 217747
**ELLWANGER LAW LLLP**
8310-1 N. Capital of Texas Highway
Suite 190
Austin, Texas 78731
jellwanger@equalrights.law
(737) 808-2260
(737) 808-2262 (facsimile)
Attorney for Plaintiff